IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

FILED
OCT 2 8 2002
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

DOCKETED
OCT 3 1 2002

| | |
|---|---|
| CENTIV, INC., a Delaware corporation, | |
| Plaintiff, | Case No. 02 C 7316 |
| v. | Judge Pallmeyer |
| | Magistrate Judge Schenkier |
| INCENTIVE SYSTEMS, INC., d/b/a CENTIV, a Massachusetts corporation, | |
| Defendant. | |

**AFFIDAVIT OF ROBERT CONLIN
IN SUPPORT OF DEFENDANT'S OPPOSITION TO
PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

I, Robert Conlin, depose and state as follows:

1.      I am employed by Incentive Systems, Inc. ("ISI") as Vice President, Product Marketing & Marketing Operations. I have been employed by ISI since April, 2000. Through my position I am familiar with ISI's products, services and existing and potential customers. I am also familiar with the industry in which ISI competes and the analysts who comment on the industry.

2.      On October 15, 2002, Steven Bonadio, the Senior Program Director at META Group, Inc., forwarded an email message and attachment to me that he received from John Bauer, the Chief Marketing Officer of Centiv, Inc. (the "Plaintiff"). A true copy of the email and attachment is attached hereto as Exhibit A.

3.      The email from Mr. Bauer to Mr. Bonadio states: "Your name and email address were provided to me as an industry analyst who might be interested in the attached press release,

17/471918.1

which is effective today." A copy of a press release issued by the Plaintiff, titled "Centiv Files Suit for Trademark Infringement," was attached to the message. The press release states that Centiv has filed a trademark infringement lawsuit against Incentive Systems. The press release also states, in part, that "[i]t's difficult to believe that Incentive Systems has chosen to knowingly violate our rights as owners of this mark."

4.    In forwarding the email from Mr. Bauer to me, Mr. Bonadio wrote: "...how they got my email is beyond me. What's this all about?"

5.    Mr. Bonadio told me that prior to receiving the email and press release from the Plaintiff, he had never heard of the Plaintiff or its services.

6.    Mr. Bonadio is an industry analyst for META Group, Inc., a large firm that covers Information Technology companies and analyzes their products. Mr. Bonadio's area of expertise includes the incentive compensation industry and the products sold by Incentive Systems. I have searched the META Group's website index and verified that META Group does not cover the point-of-purchase marketing products sold by the Plaintiff.

7.    I have also been contacted by two other industry analysts who received similar emails from the Plaintiff with the press release attached. They work for other large IT analysis firms, Gartner, Inc. and AMR Research. These analysts also cover the incentive compensation industry and the products sold by Incentive Systems, but do not cover the point-of-purchase marketing products sold by the Plaintiff. Both of these analysts have told me that prior to receiving the emails and press release from the Plaintiff, they had never heard of the Plaintiff or its services.

8.    The particular IT category in which Incentive provides software and services is usually referred to as "Enterprise Incentive Management," abbreviated "EIM." The IT consulting

firms with particular knowledge and expertise in the field of EIM include the three mentioned above -- Gartner, Inc., the largest IT consulting firm, META Group, Inc., another large IT consulting firm, and AMR Research, Inc. Other IT consulting firms familiar with EIM include Forrester Research, IDC, Giga Information Group and a number of smaller, boutique analyst firms. Each of these firms employs persons who can provide evidence concerning Incentive Systems, its products and services, the fact that our basic product, EIM software, is a recognized category of business software with a specific market, and the nature of the specialized and sophisticated market for such software. This evidence could potentially help corroborate the great differences between the EIM market and the quite different market served by the Plaintiff, as well as corroborating the differences in the channels of trade.

9.     All of these witnesses are located in the New England area. Gartner's headquarters, and its personnel who are familiar with the field of EIM software, are based in Stamford, Connecticut. META Group is also based in Stamford, Connecticut, and its personnel with similar expertise are based in Framingham, Massachusetts. AMR Research is based in Boston, Massachusetts. Forrester Research and Giga Information Group are both located in Cambridge, Massachusetts, and IDC is located in Framingham, Massachusetts.

10.     In contrast, I am personally not aware of any IT consulting firm with expertise regarding our products and services and the markets in which we operate which is located in Chicago or the surrounding area.

I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT. EXECUTED THIS _24_ DAY OF OCTOBER, 2002.

Robert Conlin

**CERTIFICATE OF SERVICE**

I hereby certify that I caused a true copy of the above document to be served upon the attorney of record for each other party by fax and mail on October 28, 2002.

Carter D. Morse, Jr.

**REDACTED**

From: Steven.Bonadio@metagroup.com [mailto:Steven.Bonadio@metagroup.com]
Sent: Tuesday, October 15, 2002 11:53 AM
To: Bob Conlin
Subject: Incentive Systems Lawsuit

Hey Bob - thought you might be interested in this, though how
they got my email is beyond me. What's this all about?

Regards,

Steve Bonadio
Senior Program Director
Application Delivery Strategies
META Group, Inc.
PH: (508) 616-4850
eFAX (603) 909-8254

Administrator:  Cindy Masaki
cindy.masaki@metagroup.com
PH: (650) 425-2431

----- Forwarded by Steven Bonadio/META Group on 10/15/2002 11:52
AM -----

```
            John Bauer
            <JBauer@centi        To:     "'Steven.Bonadio@metagroup.com'"
<Steven.Bonadio@metagroup.com>
            v.com>               cc:
                                 Subject:      Incentive Systems Lawsuit
            10/15/2002
            11:50 AM
```

Your name and email address were provided to me as an industry
analyst who might be interested in the attached press release,
which is effective today.

Sincerely,

John R. Bauer
Chief Marketing Officer
Centiv, Inc.
jbauer@centiv.com(See attached file: Incentive Systems Lawsuit
10-14-02.pdf)

---------------------------------------------------------------
       META Group's 4th Annual Infrastructure Conference
     Service-Oriented Infrastructure: Delivering on Demand
         November 11-13, 2002  -  New Orleans, Louisiana
             http://www.metagroup.com/id2002
---------------------------------------------------------------

2



**FOR IMMEDIATE RELEASE**

**Contacts:**

Tom Mason –  CFO
Centiv, Inc.
847-876-8304
Email:  tmason@centiv.com

John Bauer - Chief Marketing Officer
Centiv, Inc.
847-876-8304
Email:  jbauer@centiv.com

## Centiv Files Suit for Trademark Infringement

VERNON HILLS, Illinois, October 14, 2002 – Centiv, Inc. [NASDAQ: CNTV] announced today that it has filed a trademark infringement lawsuit against Incentive Systems, Inc. of Bedford, Massachusetts, to block their continued use of the trademark "Centiv". The suit alleges that Incentive Systems, Inc. began the use of "Centiv" as their new company name in July of this year, in violation of Centiv, Inc.'s trademark rights.

"We own this trademark, plain and simple," said William M. Rychel, President and CEO of Centiv, Inc. "It's difficult to believe that Incentive Systems has chosen to knowingly violate our rights as owners of this mark. We have tried for months to settle this amicably, but the defendant left us no choice other than to pursue this legal action to protect our good name, which is rightfully ours."

Centiv, Inc. filed the lawsuit in the Federal District Court for the Northern District of Illinois. The suit seeks a motion for preliminary injunction barring Incentive Systems, Inc. from any future use of Centiv, Inc.'s trademark CENTIV.

**About Centiv™**

Centiv, Inc. [NASDAQ: CNTV], headquartered in Vernon Hills, IL, offers solutions for locally customized POP signage to the Consumer Packaged Goods industry. The delivered product is high quality, digitally produced signage and promotional materials that are mass-customized for the unique requirements of each retail location. Centiv's P.O.P. services are currently used by leading U.S. Corporations for local and regional

customized point-of-sale programs. Additional information regarding Centiv, Inc., may be obtained by contacting Centiv headquarters, 998 Forest Edge Drive, Vernon Hills, IL 60061. Phone 847-876-8300 or fax 847-955-1269, or visit its website: http://www.centiv.com for a product demonstration.

This press release contains statements that constitute forward-looking statements within the meaning of Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended. These statements appear in a number of places in this press release and include all statements that are not historical statement of fact. The words "may," "would," "could," "will," "progress toward," "move forward," "actively pursuing," "increase," "optimistic", "expect," "estimate," "anticipate," "believes," "intends," "plans," and similar expressions and variations thereof are intended to identify forward-looking statements. Investors are cautioned that such statements are not guarantees of future performance and involve various risks and uncertainties, many of which are beyond the Company's control. Actual results may differ materially from those discussed in the forward-looking statements as a result of factors described below. These risks include, but are not limited to, competitive market pressures, material changes in customer demand, availability of labor, the Company's ability to perform contracts, governmental policies adverse to the computer industry, economic and competitive conditions, and other risks outside the control of the Company, as well as those factors discussed in detail in the Company's filings with the Securities and Exchange Commission, including "Factors That May Affect Future Results" section of the Company's Annual Report on Form 10-K for the fiscal year ended December 31, (2001.) (CH02/22180304.21)

FD·6

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

02 OCT 28 PM 5: 54

CLERK
U.S. DISTRICT COURT

CENTIV, INC., a Delaware
corporation,

                    Plaintiff,

        v.

INCENTIVE SYSTEMS, INC.,
d/b/a CENTIV, a Massachusetts
corporation,

                  Defendant.

Case No. 02 C 7316
Judge Pallmeyer
Magistrate Judge Schenkier

FILED
OCT 2 8 2002
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

DOCKETED
OCT 3 1 2002

## AFFIDAVIT OF JOHN DESMOND
## IN SUPPORT OF DEFENDANT'S OPPOSITION TO
## PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

I, John Desmond, depose and state as follows:

1.     I am employed by Incentive Systems, Inc. (the "Company") as the Vice President of Sales. I have been employed by the Company for four years. Through my position I am familiar with the Company's products, services, existing and potential customers, and sales processes.

2.     Since 1997, the Company has sold Enterprise Incentive Management (EIM) software and services. The company's product (the current release of which is called Centiv/EIM™) is specifically built to manage complex, incentive-based compensation plans and automate the entire calculation, payment and communication process across an entire organization.

3.     To illustrate, a typical large company will have employees who calculate the commission and/or bonus of each employee, according to each individual's incentive

17/471863.1

compensation plan. In the absence of an EIM software product, they would do so using internally developed software or commercially available spreadsheets and calculators. Our software automates that process, integrates with an existing software platform (such as Oracle) to collect all the data, performs complex calculations, provides advanced reporting functions, and allows a much greater degree of flexibility to change the incentive plans, among other benefits.

4.      The overwhelming majority of the Company's existing and prospective customers are located in the following industries: financial services, telecommunications, technology, manufacturing and medical/pharmaceutical. Of approximately 65 customers of the Company, only one is engaged primarily in the sale of consumer retail goods (juice). This customer was developed over 3 years ago, and we have not made another sale to a retail company since then. Every other customer of the Company sells its goods and services to businesses.

5.      Consumer goods companies are not a focus of our sales effort. For example, of the "pipeline" of potential sales and customer-specific presentations currently in process, none of these involves a consumer goods company. Furthermore, although we have a group of sales employees whose responsibility is to try to develop leads at corporations that are potential purchasers of our product, these employees are not specifically targeting consumer goods companies, and we have no plan to ask them to do so.

6.      The Company's software products and services are very expensive, costing a minimum of $500,000. The average price paid by our customers this year has been over $2 million. In addition, customers who purchase our software typically need to purchase significant hardware (storage devices, networking equipment, etc.) to enable our product to operate, to store data, and to interact with their existing IT operations platform. Thus, customers considering purchasing our product are typically looking at a total expenditure of $4-6 million.

7.    In part because of the large expenditure involved, the sales process for our product is quite lengthy, typically taking from 4 to 8 months from the point of a potential customer expressing serious interest until closure. An internal spreadsheet setting forth this process is attached hereto as Exhibit A. The process begins with lead generation, during the course of which the contact at the prospective customer will be briefed about our company and its software product, and provided with a package of materials including our logo (identifying us as "Centiv/Incentive Systems"). The process evolves into multiple meetings with various types of employees in the company. These would include the finance department (which must typically approve large purchases of this type, the information technology group (which must implement the change and integrate the product with the company's existing IT platform), and the sales organization (where most incentive compensation occurs). Occasionally the human resources department would also be involved.

8.    In the average successful process, there would be a minimum of 5 face to face meetings and easily over a dozen in a larger deal. By the level of stages 3 and 4 as described in the attached spreadsheet, these meetings usually include the Chief Financial Officer, the Chief Information Officer or head of IT, and the Vice President of Sales. Before successful closure, the Chief Executive Officer would typically approve the purchase of our product, and sometimes the purchase receives board approval. The marketing and retail divisions of a corporation would typically not be involved at all.

9.    To the best of my knowledge, there is not a single company that has ever purchased our products and the plaintiff's products. Furthermore, to the best of my knowledge, no existing or perspective customer has ever confused the Company with the Plaintiff.

I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE

AND CORRECT. EXECUTED THIS __th DAY OF OCTOBER, 2002.

John Desmond

### CERTIFICATE OF SERVICE

I hereby certify that I caused a true copy of the above document to be served upon the attorney of record for each other party by fax and mail on October 16, 2002.

Carter D. Morse, Jr.

17/471622.1                                    - 4 -

**Incentive Systems**
**Funnel Analysis**

| Phase Criteria | Major Tasks | Sub Tasks |
|---|---|---|
| **...ifing** | | |
| ...fied suspected need and made initial contact | | |
| ...fied who to contact to qualify the opportunity | | |
| **...alified Corporate Sales** | REDACTED | |
| ...ed an acknowledged need and appropriate sponsor | | |
| ...viable solution to the need | | |
| ...a solid "Can Win" projection | | |
| ...ect has, or can get budget for our products & services | | |
| **...alified Field Sales** | | |
| ...ed prospect's budgeting process | | |
| ...ed prospect's decision-making process | | |
| ...a Sponsor | | |
| ...ect agreed to seriously considered our plan and help build it | | |
| ...an estimated "Time to close" | | |
| **...veloped** | | |
| ...a solid "Will Win" projection | | |
| ...sor has committed to near term go/no go selection date | | |
| ...ect has budgeted money to buy product & service | | |
| ...mentation plan approved by us and accepted by prospect | | |
| ...ect has everything needed to make purchase decision | | |
| ...tunity has been wargamed | | |
| ...ngency plans are ready | | |
| **...spect** | | |
| ...mer made significant non-recoverable investment | | |

**Incentive Systems**
**Funnel Analysis**

REDACTED

Customer made significant emotional commitment to proceed
Implementation plan approved and in motion
Competitive Counter attack has been defeated
Formal paperwork (SLA, SOW, Schedule A) received
Product has been shipped

**07-Completed**
Customer confirms decision to go with Incentive was right
Customer is a solid reference
All billings are cleared...no holdbacks remain
Qualified expansion opportunities are in the funnel

ED-6

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

02 OCT 28 PM 5: 54

CLERK
U.S. DISTRICT COURT

CENTIV, INC., a Delaware
corporation,

                    Plaintiff,

          v.

INCENTIVE SYSTEMS, INC.,
d/b/a CENTIV, a Massachusetts
corporation,

                    Defendant.

Case No. 02 C 7316
Judge Pallmeyer
Magistrate Judge Schenkier

FILED
OCT 2 8 2002
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

DOCKETED
OCT 3 1 2002

**AFFIDAVIT OF STEVEN BONADIO
IN SUPPORT OF DEFENDANT'S OPPOSITION TO
PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

I, Steven Bonadio, depose and state as follows:

1.     I am employed as Senior Program Director by META Group, Inc., which

performs consulting and analysis in the information technology field.  We cover and analyze a

number of companies selling enterprise software, including Incentive Systems, Inc. (now known

as Centiv).

2.     On October 15, 2002, I received an e-mail and an attached press release from an

employee of a company called Centiv, Inc.  A print-out copy of that e-mail is attached.  Prior to

receiving this e-mail, I had never heard of Centiv, Inc. (the Illinois company which is described

in the attached press release), nor do I believe my firm provides coverage or analysis of this

company's products.

17/471879.1

I declare under penalty of perjury that the foregoing is true and correct. Executed this 25 day of October, 2002.

_____
Steven Bonadio

### CERTIFICATE OF SERVICE

I hereby certify that I caused a true copy of the above document to be served upon the attorney of record for each other party by fax and mail on October 28, 2002.

_____
Carter D. Morse, Jr.



| | | |
|---|---|---|
| John Bauer <JBauer@centiv.com > 10/15/2002 11:50 AM | To: | "'Steven.Bonadio@metagroup.com'" <Steven.Bonadio@metagroup.com> |
| | cc: | |
| | Subject: | Incentive Systems Lawsuit |

Your name and email address were provided to me as an industry analyst who might be interested in the attached press release, which is effective today.

Sincerely,

John R. Bauer
Chief Marketing Officer
Centiv, Inc.

jbauer@centiv.com Incentive Systems Lawsuit 10-14-02



## centiv™

**FOR IMMEDIATE RELEASE**

**Contacts:**

Tom Mason –  CFO
Centiv, Inc.
847-876-8304
Email:  tmason@centiv.com

John Bauer - Chief Marketing Officer
Centiv, Inc.
847-876-8304
Email:  jbauer@centiv.com

## Centiv Files Suit for Trademark Infringement

VERNON HILLS, Illinois, October 14, 2002 – Centiv, Inc. [NASDAQ: CNTV] announced today that it has filed a trademark infringement lawsuit against Incentive Systems, Inc. of Bedford, Massachusetts,  to block their continued use of the trademark "Centiv".  The suit alleges that Incentive Systems, Inc. began the use of "Centiv" as their new company name in July of this year, in violation of Centiv, Inc.'s trademark rights.

"We own this trademark, plain and simple," said William M. Rychel, President and CEO of Centiv, Inc. "It's difficult to believe that Incentive Systems has chosen to knowingly violate our rights as owners of this mark. We have tried for months to settle this amicably, but the defendant left us no choice other than to pursue this legal action to protect our good name, which is rightfully ours."

Centiv, Inc. filed the lawsuit in the Federal District Court for the Northern District of Illinois.  The suit seeks a motion for preliminary injunction barring Incentive Systems, Inc. from any future use of Centiv, Inc.'s trademark CENTIV.

### About Centiv™

Centiv, Inc. [NASDAQ: CNTV], headquartered in Vernon Hills, IL, offers solutions for locally customized POP signage to the Consumer Packaged Goods industry.  The delivered product is high quality, digitally produced signage and promotional materials that are mass-customized for the unique requirements of each retail location.  Centiv's P.O.P. services are currently used by leading U.S. Corporations for local and regional

customized point-of-sale programs. Additional information regarding Centiv, Inc., may be obtained by contacting Centiv headquarters, 998 Forest Edge Drive, Vernon Hills, IL 60061. Phone 847-876-8300 or fax 847-955-1269, or visit its website: http://www.centiv.com for a product demonstration.

This press release contains statements that constitute forward-looking statements within the meaning of Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended. These statements appear in a number of places in this press release and include all statements that are not historical statement of fact. The words "may," "would," "could," "will," "progress toward," "move forward," "actively pursuing," "increase," "optimistic", "expect," "estimate," "anticipate," "believes," "intends," "plans," and similar expressions and variations thereof are intended to identify forward-looking statements. Investors are cautioned that such statements are not guarantees of future performance and involve various risks and uncertainties, many of which are beyond the Company's control. Actual results may differ materially from those discussed in the forward-looking statements as a result of factors described below. These risks include, but are not limited to, competitive market pressures, material changes in customer demand, availability of labor, the Company's ability to perform contracts, governmental policies adverse to the computer industry, economic and competitive conditions, and other risks outside the control of the Company, as well as those factors discussed in detail in the Company's filings with the Securities and Exchange Commission, including "Factors That May Affect Future Results" section of the Company's Annual Report on Form 10-K for the fiscal year ended December 31, (2001.) (CH02/22180304.21)

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

02 OCT 28 PM 5: 54

CLERK
U.S. DISTRICT COURT

CENTIV, INC., a Delaware
corporation,

                Plaintiff,

      v.

INCENTIVE SYSTEMS, INC.,
d/b/a CENTIV, a Massachusetts
corporation,

              Defendant.

Case No. 02 C 7316
Judge Pallmeyer
Magistrate Judge Schenkier

FILED
OCT 28 2002
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

DOCKETED
OCT 3 1 2002

### AFFIDAVIT OF NANCY MCINTYRE
### IN SUPPORT OF DEFENDANT'S OPPOSITION TO
### PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

I, Nancy McIntyre, depose and state the following this 25th day of October, 2002:

1.     I am employed by Incentive Systems, Inc. ("ISI") as the Executive Vice President of Worldwide Marketing and Strategic Alliances. I have been employed by ISI since March, 1999. Through my position I am familiar with ISI's products, services, finances, customers, marketing plans and strategies, partners and investors. In addition, through my position and experiences I am familiar with ISI's competitors, industry analysts and the overall marketplace for incentive compensation software products.

**The Parties Sell Non-Competing Products.**

2.     ISI is a software vendor. Its corporate headquarters is located in Bedford, Massachusetts. ISI currently has approximately 134 employees and annual sales projected for this fiscal year (through March 31, 2003) in the amount of $29,000,000.

3.      Since 1997, ISI has sold Enterprise Incentive Management (EIM) software and services. EIM software automates and streamlines compensation management processes for "Global 5000" companies. In simpler terms, ISI sells computer software and services for the design and management of sophisticated employee compensation programs. ISI's software is sold into a new and highly competitive market segment. While all the competitors in this market deliver software and services to manage complex, incentive-based compensation plans including the automation of calculation, payment and communication process across the organization, ISI's product is the only software solution built using a reflective data model on a scalable, net native architecture.

4.      ISI's products are not purchased on-line, off-the-shelf or on an impulse basis by its customers. The products and services are expensive, costing a minimum of $500,000. The average price paid by our customers this year is over $2 million. When considered together with the hardware that must be purchased from another vendor to implement ISI's product, the typical customer is looking at a multimillion dollar expenditure. The sales cycle or purchasing process lasts an average of 4 to 8 months, and involves repeated conferences, demonstrations, and prolonged contract negotiations. In the average sale, there are a minimum of five face to face meetings, and more than a dozen in larger deals. The selection of the software vendor is usually made by a committee comprised of the head of compensation, Human Resources, sales operations (for a commission system), the Finance organization and the Information Technology group. After the product is licensed, ISI then provides implementation services, technical support, and extensive training to the customer personnel in how to use the software  The user of the software is typically the compensation manager or the commissions manager in the central corporate headquarters.

5.      The products and services of the Plaintiff are completely different from those sold by ISI.  The Plaintiff is not a software company (except to the extent that its services, like most companies' services, utilize software to some degree).  The Plaintiff has approximately 31 employees according to its website, and annual sales in the amount of $12 million.

6.      According to its website (under the drop-down menu "Products & Services"), the Plaintiff offers three different services.  The first is called "Instant Impact," a system which allows users to order customized in-store "point-of-purchase" (or ("POP") materials remotely using internet-based templates.  A copy of the "Instant Impact" page from Plaintiff's website is attached hereto as **Exhibit A**.  In this web demonstration the Plaintiff illustrates its service by showing that from remote locations over the internet, sellers of retail products such as Smirnoff Vodka can create signage such as pop-up table tents, indoor banners and posters that say "Summer Time Special $15.95."  The Plaintiff then delivers the materials within 48 hours.  The Plaintiff advertises that the service is "so simple no training is required," "even first time users can make a great looking sign" and "[n]o special equipment or technical experience is required."

7.      The Plaintiff also offers "Design" services.  A copy of the "Design" page from Plaintiff's website is attached hereto as **Exhibit B**.  If the customer is unable to create a design template on its own, the Plaintiff's "skilled and experienced design department will create highly effective templates" that "reflect a corporate brand identity through colors, fonts, logos, etc."

8.      Finally, the Plaintiff offers "Print Production" services.  A copy of the "Print Production" page from Plaintiff's website is attached hereto as **Exhibit C**.  This includes digital printing and finishing capabilities (including mounting, laminating and trimming).

9.      In its 2001 Annual Report for the fiscal year ended December 31, 2001, the Plaintiff summarizes its services as follows:

> For many years, retailers and manufacturers who sell their products through retail channels have utilized POP signage to promote products and services to consumers. Typically, that signage has been produced using manual methods (chalkboards, markers, etc.) by in-store personnel, or printed at a central corporate location using standard lithography printing methods and distributed to retail stores. Recent advances in software and hardware have created a new market for customer POP signage using display graphic printers, software and media. This technology allows retailers and wholesalers to quickly and easily create, print and display retail signs that are more responsive to their needs in full color with photo-realistic quality.

See Annual Report, filed by the Plaintiff on April 1, 2002 ("Annual Report"), excerpts from which are attached hereto as **Exhibit D**.

**The Products are Marketed and Sold to Different Customers through Different Channels.**

10. The parties market and sell their products to entirely different customers. The overwhelming majority of ISI's existing and prospective customers are located in the following industries: financial services, telecommunications, technology, manufacturing and medical/pharmaceutical. For example, the three most recent customers to license ISI's product are Mutual of New York (insurance), CareFirst of Maryland (health care), New England Business Services (accounting/placement). Consumer goods companies are not a focus of ISI's sales effort. ISI has 65 customers (out of which 16 are through an independent distributor). Out of these customers, only four engage in the retail sale of consumer goods in any fashion, and only one of the four accounts for the majority of its business through retail consumer sales.[1] The remaining customers sell their goods and services exclusively to businesses. A complete list of ISI's customers is attached hereto as **Exhibit E.**

---

[1] Kinkos is one of the four customers of ISI who sells consumer goods. There is very little likelihood of confusion on the part of Kinkos, however, as it is a competitor of the Plaintiff that markets point-of-purchase advertising services.

18/460921.1                                    - 4 -

11.    In addition, of the "pipeline" of potential sales and customer-specific presentations currently in process, none of these involves consumer goods companies. I am not aware of a single customer or "pipeline" potential customer which ISI and the Plaintiff have in common.

12.    ISI markets its products to high level executives in charge of employee compensation, typically located within human resources and information technology departments of large corporations. For example, ISI markets its products to potential customers at a series of trade shows across the country for human resources and compensation executives. These tradeshows concern compensation issues, and do not concern marketing or advertising issues. To the best of ISI's knowledge, the Plaintiff did not attend any of these trade shows. A copy of the trade shows attended by ISI in 2002 is attached hereto as **Exhibit F**.

13.    As opposed to compensation and human resources personnel, the Plaintiff's product is designed to be used by marketing, brand and retail managers. See S-3 Registration Statement, filed by the Plaintiff on April 26, 2002 ("Prospectus"), a copy of which is attached hereto as **Exhibit G**; Press Release issued by the Plaintiff, dated August 6, 2002, a copy of which attached hereto as **Exhibit H**. In contrast, ISI does not promote its products to marketing, advertising or retail personnel because the software does not pertain, in any way, to promotional or signage activities.

14.    The competitors of both parties also differ from each other. ISI's competitors, including software giants Oracle, PeopleSoft and Seibel Systems, market and sell incentive compensation software and integration services to large corporations. The Plaintiff's competitors, including Insignia Systems, Inc. and Cataline Marketing, market and sell point-of-purchase services. See Prospectus, attached hereto as Exhibit G.

15.     Both parties engage in partnerships with companies to enhance the effectiveness of their products. The total lack of overlap between the types of partners affiliated with the parties further illustrates the complete difference between the industries in which the products are sold. The Plaintiff's website explains that the Plaintiff is looking to engage in partnerships "to solve print communication problems" with the following types of companies: ad agencies, graphic design firms, event marketing firms, promotional marketing firms, print brokers, commercial printers, print industry suppliers, and B2B exchanges. A copy of the partner listings from the Plaintiff's website is attached hereto as **Exhibit I**. As opposed to marketing and printing firms, ISI has engaged in partnerships with systems integrators, compensation design firms, software firms, and human resource strategy firms. A copy of ISI's partner list from its website is attached hereto as **Exhibit J**.

**ISI Shortens its Name from Incentive Systems to Centiv.**

16.     By virtue of consistent use in commerce since 1997, ISI owns rights in the trademarks INCENTIVE® and INCENTIVE SYSTEMS(with design)® in the field of EIM software and services. ISI owns U.S. Registrations No.s 2,404,594 and 2,503,423 for these trademarks.

17.     On July 29, 2002, ISI announced that it was shortening its name to "Centiv" as its corporate identity and brand. ISI did not choose the name "Centiv" for the purpose of confusing customers, stealing customers from the Plaintiff, or misappropriating the Plaintiff's good will. The name and mark CENTIV was chosen because it is a logical and easily recognizable derivative of the mark INCENTIVE®, on which ISI had already spent millions of dollars to establish as a recognized brand. It is a shorter form of our current brand that is more distinctive and differentiated in our market. (ISI's advertising expenses for fiscal year 2002 totaled $1.65 million). In fact, we created a flash video at the time of the change for marketing purposes that

visually shows how "Centiv" was created from "Incentive" by dropping the "In" and "e." We decided to shorten our product and company brand name when it became apparent that our competitors were claiming to offer "incentive management" products and we needed to differentiate from such terms.

18.     The logo used by ISI in its marketing materials contains a carrot design (which is intended to be the graphic equivalent of an incentive), the mark CENTIV with the letter "C" capitalized, and the name "INCENTIVE SYSTEMS" clearly printed underneath the carrot and "Centiv." A copy of the logo, illustrated on ISI's website, is attached hereto as **Exhibit K**. At no time does the logo ever display the name "Centiv" without the carrot and the name "INCENTIVE SYSTEMS" printed underneath. The logo appears on ISI's letterhead, throughout ISI's website, and most if not all of ISI's marketing materials. ISI does not have any immediate plan to remove the name "INCENTIVE SYSTEMS" from the logo. A copy of ISI's letterhead is attached hereto as **Exhibit L**.

19.     ISI has also named its product line "Centiv/EIM™." Like the logo, the term "Centiv" never appears by itself when ISI refers to its product line. Instead, the product is always referred to as "Centiv/EIM™."

20.     To promote the change from "Incentive" to "Centiv," ISI engaged in a wide-ranging marketing campaign that included the following: letters and email notices to approximately 7,000 partners, existing customers and prospective customers; redesign of its website; press releases; print advertisements; and printing the logo on its letterhead and company paraphernalia (i.e., mugs, mouse pads, etc.). Copies of the letters and print advertisements are attached hereto as **Exhibit M**. ISI has also issued a quarterly newsletter with the logo, a copy of which is attached hereto as **Exhibit N**.

**There is No Confusion.**

21.     To the best of ISI's knowledge, there is not a single customer who has purchased products from both ISI and the Plaintiff.

22.     To the best of ISI's knowledge, no existing or prospective customer has ever confused ISI with the Plaintiff.

23.     To the best of ISI's knowledge, ISI has never received a single email that was intended for the Plaintiff.

24.     I am not aware of any person in the venture capital or investment community ever being confused between the parties or their products.

**Location of Witnesses.**

25.     The vast majority of ISI's employees work in Bedford, Massachusetts and live in the Boston area.  The activities about which the plaintiff complains -- the adoption of the CENTIV mark, the advertising of that mark to customers, and the sales of services using that mark -- occurred at our Bedford facility.

26.     Though ISI has a regional office in Chicago, Illinois, this space consists of no more than two offices to which only three employees are assigned on a full time basis.  None of the three employees have any decision making authority on behalf of ISI and would not testify as to any issue raised in this action.

27.     The majority of ISI's customers are located in the Northeast.  The location of our direct customers breaks down as follows:  24 in the Northeast (MA, NH, NJ, NY, PA and MD), of which 13 are in Massachusetts and New Hampshire; 5 in the Midwest (IL, MN); 5 in the South (VA, FL, GA); 14 in the west (AZ, CA, CO, WA); and one located internationally (France).  Many of these customers may be called upon to testify that prior to this action they never heard of the Plaintiff or its services, they never confused ISI's mark for the Plaintiff's, and

they have no need for the services offered by the Plaintiff. It would be more convenient for these customers to testify in Boston, Massachusetts, than in Chicago, Illinois.

28.     ISI has three major investors: Polaris Venture Partners (located in Waltham, Massachusetts), BancBoston Ventures (located in Boston, Massachusetts) and Thomas Weisel Capital Partners (located in California). To the extent the Plaintiff alleges confusion among investors (which it does in its affidavit), employees or directors of these funds would be important witnesses to rebut this claim. It would be more convenient for ISI's investors to testify in Boston, Massachusetts, than in Chicago, Illinois.

29.     MicroArts Inc. is the branding consultant with whom we developed the Centiv name and mark. They also provide marketing services such as promotional program design and website design. Employees of MicroArts will be important witnesses in this case. MicroArts is based in New Hampshire, and it would be much more convenient for these witnesses to testify in Boston, Massachusetts.

30.     ISI employs FitzGerald Communications as its public relations firm. FitzGerald Communications is located in Cambridge, Massachusetts, and is knowledgeable about ISI's press outreach efforts. FitzGerald employees are likely to be called as witnesses to testify that ISI seeks to gain news coverage in  publications different than the Plaintiff, and it would be more convenient for FitzGerald Communications' employees to testify in Boston, Massachusetts, than in Chicago, Illinois.

**ISI Will be Irreparably Harmed if the Injunction Issues.**

31.     The software industry relating to incentive compensation services is highly competitive. Establishing a brand identity that is recognized and trusted in the marketplace is a crucial component for succeeding in the industry. Thus far ISI has invested substantial resources and capital to shift its brand identity in the marketplace from "Incentive" to "Centiv." ISI would

be severally and irreparably harmed if it were enjoined from marketing its products under the mark CENTIV.

32.     The immediate out-of-pocket costs of announcing a name change and removing the CENTIV mark would be extremely high.  Even more damaging, however, is the immeasurable loss of confidence and brand recognition in ISI from its partners, existing customers, industry analysts and prospective customers.  A name change, coming on the heels of the change from "Incentive" to "Centiv" (i.e., two name/identity changes in less than three months), would hopelessly confuse ISI's identity among is existing and potential customers.  In addition, the change would be viewed within the industry as arbitrary, indecisive, and signaling a change in the direction of ISI, even though this is not the case.  This would result in loss of goodwill and sales which could not be quantified.  We would also clearly lose ground on a critical report from an industry analyst (Gartner) that measures the vendors "ability to execute", meaning deliver on corporate goals and initiatives.  These reports are relied upon heavily by customers and have an immediate impact on our sales.

I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.  EXECUTED THIS 25th DAY OF OCTOBER, 2002.

Nancy McIntyre

### CERTIFICATE OF SERVICE

I hereby certify that I caused a true copy of the above document to be served upon the attorney of record for each other party by *facsimile + mail* on October 26, 2002.

Mark P. McKenna

# SEE CASE FILE FOR EXHIBITS